TRADERS AND MECHANICS' INSURANCE COMPANY *vs.*
EPHRAIM BROWN & others.

Middlesex. March 17, 18. — Sept. 10, 1886. W. ALLEN & HOLMES, JJ., absent.

A mutual fire insurance company was incorporated in 1848, subject to the provisions of the Rev. Sts. *c.* 37. In 1854, it was authorized, on receiving from the subscribers thereto a guaranty capital of a certain amount, to make insurance "otherwise than on the mutual principle," and was made subject to the Rev. Sts. *c.* 37, and all subsequent acts relating to insurance companies. To induce persons to subscribe to the guaranty capital, it adopted certain by-laws, by which the directors were authorized, before obtaining subscriptions, to determine the rate of the semiannual dividend, which rate should not be liable to be reduced without the written consent of each shareholder. The directors accordingly fixed such rate. The by-laws also provided that the funds of the company arising from premiums or assessments should be appropriated in a way which treated the mutual and stock departments as one. The St. of 1856, *c.* 252, § 36, provided that all business done by mutual insurance companies, on account of each department, should be kept separate. From 1854, the insurance company in question kept distinct and separate accounts of the business of the two departments. In 1882, the company, having a large surplus accumulated from the earnings of the stock department, voted to discontinue this department, and to redeem its guaranty capital. *Held,* on a bill in equity, under the Pub. Sts. *c.* 119, § 94, brought for this purpose by the company against the shareholders of the guaranty capital, that the by-laws were contrary to the provisions of the Rev. Sts. *c.* 37, and were void; that the company had acted rightly in keeping separate the accounts of the two departments; and that the shareholders of the guaranty capital were entitled to the surplus belonging to the stock department.

BILL IN EQUITY, filed October 4, 1883, under the Pub. Sts. c. 119, § 94,* by a mutual fire insurance company, against the holders of certificates of its guaranty capital stock, to redeem and cancel said stock. Hearing before *Field*, J., who reported the case for the consideration of the full court, in substance as follows:

The plaintiff was incorporated by the St. of 1848, c. 124, by the name of the Lowell Traders and Mechanics' Mutual Fire Insurance Company, "for the purpose of insuring dwelling-houses and other buildings, and personal property, within the Commonwealth, against loss by fire, with all the powers and privileges, and subject to all the duties, liabilities, and restrictions, set forth in" the Rev. Sts. cc. 37, 44. From the time of its incorporation until 1854, the company carried on business, in pursuance of its charter, as a mutual fire insurance company only.

By the St. of 1854, c. 76, the plaintiff was authorized, on receiving from the subscribers thereto a guaranty capital of $50,000, to be paid in within two years, to "make insurance against fire and against maritime losses, otherwise than on the mutual principle; with all the powers and privileges, and subject to all the duties, liabilities, and restrictions, set forth in" the Rev. Sts. c. 37, "and in all subsequent acts relating to insurance companies." The act also changed the name of the company to the "Traders and Mechanics' Insurance Company."

The last-named act was duly accepted by said company, at a meeting thereof duly called and held on May 8, 1854; and at an adjournment of the same meeting, on June 19, 1854, the following by-laws, among others, were duly adopted by said company, as an inducement to make subscriptions to said guaranty capital:

---

* This section, which is a reënactment of the St. of 1881, c. 269, is as follows: "Any mutual fire insurance company authorized to issue policies on the stock plan, which cancels all outstanding policies issued by its stock department, and, at a meeting called for the purpose, votes to discontinue its stock department and to redeem its guaranty capital stock, may redeem and cancel the same in such manner and upon such terms and conditions as the Supreme Judicial Court, upon an application in equity made by the company, and after such notice of the application to all parties in interest as the court shall order, and a hearing, determines and adjudges to be just and equitable."

" Article 4.   The directors shall cause books to be opened for the subscription of a guaranty capital of fifty thousand dollars ($50,000), which shall be divided into shares of one hundred dollars each, and certificates issued therefor in such form as the directors shall prescribe.   And, before such books are opened, the directors shall determine the rate per centum of the semi-annual dividend by vote, which shall be duly recorded; and the rate then determined shall not be liable to be reduced without the written consent of each and every shareholder."

" Article 10.   The funds of this company arising from premiums or assessments, or in any other manner, shall be appropriated to the payment, first, of expenses; second, of losses by fire; third, dividends on the guaranty capital, and to make good any reduction in the amount of said capital; and fourth, return premiums and dividends on policies upon the mutual principle, as they shall expire.

" Article 11.   In case the guaranty capital shall, from any cause, be reduced, the directors shall assess such sums as may be necessary to restore the same, upon the members of the corporation, in the manner required by the Revised Statutes to pay losses."

" Article 19.   These by-laws, with the exception of the fourth article, may be altered by the votes of two thirds of the legal voters present at any annual or other legal meeting of the company, notice of the proposed alteration having been set forth in the call for such meeting; but the fourth article shall never be altered without the written consent of each and every holder of shares of the guaranty capital."

It was voted " that the same shall take effect when the capital stock shall be paid in, and that the directors be authorized to receive subscriptions to said capital stock at such times and in such sums as they may determine, and invest the same according to the provisions of the statutes."

The following by-laws were also adopted at said meeting:

" Article 1.   Each person or corporation insured in this company upon the mutual principle shall be a member thereof, and subject to the by-laws and regulations of the company.

" Article 2.   The annual meeting of the members of the corporation for the choice of directors shall be holden at the office

of said company, on the second Monday in December, in every year, at 2 o'clock P. M. Ten members shall constitute a quorum. All questions shall be decided by a majority vote, except such as shall be otherwise specially provided for in these by-laws. Each member shall be entitled to as many votes as he has policies upon the mutual principle, but no one member shall be allowed more than five votes. Special meetings of the corporation may be ordered by the president, or five directors, and shall be so ordered whenever twenty of the members request it in writing. Notice of all meetings of the corporation, signed by the secretary, shall be given in two or more newspapers published in Lowell, seven days at least before the meeting."

The directors of said company, at a meeting duly held, subsequently to the adoption of said by-laws and votes, voted " that the semiannual dividend to be paid on the guaranty capital be not less than four, nor more than five per cent, as the directors may from time to time determine."

None of said by-laws or votes have ever been altered or repealed. After the passage of the vote above named, the directors in behalf of the company, and in pursuance of the authority, and upon the terms, conditions, and inducements of the said by-laws and votes, obtained from various individuals subscriptions for, and the due payment of, the sum of $50,000 as a guaranty capital. From 1854, the time of receiving said guaranty capital, until November 8, 1880, the company transacted insurance business upon both stock and mutual principles. It issued two forms of policies, one showing on its face that it was a stock policy, and the other showing on its face that it was a mutual policy.

By the St. of 1870, c. 232, the company was "authorized to increase its guaranty capital, by an addition thereto of the sum of fifty thousand dollars, to be divided into shares of one hundred dollars each." This act was duly accepted by the company, and, in pursuance thereof, the company, in 1870, received subscriptions for, and payment by various persons of, the additional guaranty capital, upon the same terms and conditions and inducements as it received the original capital, as above stated.

In 1854, when the company obtained its original guaranty capital, it had outstanding risks to the amount of $3,729,834, on

which it had received cash premiums to the amount of $21,483.58. It owed for losses ascertained and unpaid $2422. Its assets consisted of premium notes of policy holders, to the amount of $274,372.33, subject to assessment to twice that amount, and it had cash and other property valued at $6902.96.

When the additional guaranty capital was obtained, the corporation had a surplus in cash assets of about $184,000, and premium notes to about $325,000, liable to assessment.

Since receiving its original guaranty capital, the company has always kept separate accounts of the business of the stock and mutual departments, and of the receipts and expenditures in each, and none of the assets or earnings of one have been applied to payment of losses or dividends of the other. It has paid from the earnings of the stock department semiannual dividends to the holders of the stock in the guaranty capital, amounting to not less than eight per cent per annum upon the par of said capital, from the time the same was paid in up to July 1, 1883, with the exception of a few months, (the exact time and amount of the omission, if material, to be ascertained by a master in chancery,) and the company has at various times paid from said earnings semiannual dividends of five per cent on said stock.

At a meeting of the company on November 8, 1880, it was voted, that the company discontinue issuing stock policies on and after November 30, 1880.

On January 18, 1882, the company, at a meeting duly called for that purpose, voted to discontinue its stock department, and to redeem its guaranty capital. The validity of this vote is not disputed. The holders of stock of the guaranty capital were not present nor represented at said meeting, and never consented to such discontinuance or redemption. Before the filing of this bill, the company cancelled all policies issued and outstanding in the stock department.

At the time of the filing of this bill, there was a surplus of more than $40,000 above the par of its capital stock, accumulated from the earnings of the stock department above said dividends and all expenses, and remaining after the cancelling of said policies. (The exact amount thereof, if material, is to be ascertained by reference to a master.) And in the mutual department there were outstanding policies to the amount of $17,621,921, the cash

premiums received thereon being $126,682.98; and the company held premium notes of policy holders to the amount of $253,365.96, liable to assessment to twice that amount, and cash and other property to the credit of the mutual department to the amount of $381,478.98.

The judge found as a fact, if competent, that many of the defendants, the present holders of shares in said capital stock, paid a premium therefor above the par value thereof, and such shares have for many years commanded, and been sold at, a premium in the market.

By neither of the acts authorizing said capital, nor by any by-law or votes of the company or its directors, or otherwise, except so far as appears by the facts and statements herein and the public laws relating to said company, were any time or terms fixed or agreed upon for the liquidation, redemption, or cancelling of said capital stock.

None of the earnings of the stock department have ever been paid as dividends to the holders of policies in the mutual department, or applied to payment of losses under policies issued by the mutual department, but the mutual department from time to time purchased shares of stock in the stock department, amounting in the aggregate, to the time of filing this bill, to three hundred and twenty-nine shares, which shares were held as assets of the mutual department, and the mutual department drew dividends thereon from the earnings of the stock department at the same rate as were paid to other stockholders; and the salaries, rents, and other general expenses of the company were divided between and borne by the two departments, in proportion to the amount of cash premiums received in the respective departments, up to the time of the discontinuance of issuing policies in the stock department, since which time the expenses have been divided as the directors have ordered. No policies were ever issued in the mutual department for a longer period than five years.

By the Boston fire of 1872, the guaranty capital was impaired to the extent of $31,757.45. No assessment was made upon the mutual policy holders to make good this loss; but the same was immediately made good by premiums received from stock policies issued.

The company paid the tax assessed on account of its guaranty capital, and charged the amount so paid in its account of the business of the stock department.

The plaintiff contends that it should be authorized to repay to the parties entitled thereto the amount of the guaranty capital, together with such additional sum as said amount, if lent with safe collateral security, would have earned from the date of the filing of its bill up to the date of the final decree in the case.

The minority stockholders contended that the legal effect of the payment of the capital was to constitute the subscribers thereto members of a combined company, each with distinct and independent rights; that under the St. of 1854, therefore, the corporation became a stock and a mutual company, or "combined companies," each of which had a legal right in the joint management of the affairs of the corporation.

It was also contended, that, on the true construction of the St. of 1854 and the by-laws subsequently adopted, the capital was to be devoted to a business in which the stock department or company was the only real insurer, and that the capital was paid in on a trust for the exclusive benefit of the holders; that, by law, the guaranty capital, so called, was not in the nature of a debt of the mutual department of a mutual insurance company, but that the capital and surplus were the assets of a stock company, to be distributed on settled principles of equity; that in so far as the by-laws of the corporation purport to guarantee the principal or dividends thereon, or to authorize assessments of mutual policy holders to pay losses on the stock plan, or to make good a deficiency in the guaranty capital, or to exclude holders of shares from being members of the corporation, they were void.

It was also contended that the facts did not prove a contract between the parties, or between the mutual company and the original subscribers to the capital; that a decree ought to be entered dissolving the association; and that the assets of the stock company, including all the reserved or surplus earnings thereof, should be distributed to the stockholders, according to their several shares.

Other stockholders contended that the acts, by-laws, votes, and facts above set forth constituted a contract between the

corporation and the stockholders, whereby the corporation was bound to pay the stockholders, respectively, four per cent of the par value of their shares semiannually forever; and that, if it were relieved from the obligations of that contract, it should pay said stockholders the fair value of such contract to them, namely, the value of a perpetual annuity equal to $8 for each share in the capital stock; or, if they were not entitled to such compensation, then they were entitled to have distributed among them, *pro rata*, the full value of all the assets of the stock department, and such further assets, if any, as had been improperly diverted therefrom, or applied to the benefit or expenses of the mutual department.

The case was reserved for the determination of the full court upon the questions whether the plaintiff was entitled to redeem its guaranty capital stock, and, if so, upon what terms and conditions, and generally upon all questions of law arising upon the report; it being agreed by the parties, that, if the court should decide, upon the facts found, that the plaintiff was entitled to redeem and cancel its capital stock, and the terms and conditions or principles on which this might be done, then, if any other facts than those found were necessary to be determined in order to apply these terms and conditions or principles to the subject matter, the cause might be referred to a master for that purpose, if the full court or a single justice should approve such a reference.

*G. F. Richardson*, (*D. S. Richardson* with him,) for the plaintiff.

*G. D. Noyes*, for the minority stockholders.

*E. R. Hoar*, for the other defendants.

GARDNER, J. In January, 1882, the plaintiff company voted to discontinue its stock department, and to redeem and cancel its guaranty capital stock; and has now, under the Pub. Sts. *c.* 119, § 94, applied to this court to determine upon what "just and equitable terms and conditions," and in what manner, this may be accomplished.

At the time of the passage of the St. of 1854, *c.* 76, authorizing the company to make insurance "otherwise than on the mutual principle," it was the intention of the Legislature to empower it to transact business upon the stock principle, in

addition to insuring upon the mutual plan, for which the company was chartered in 1848. The Rev. Sts. *c.* 37, made provision for the way and manner in which insurance companies should carry on business under the stock plan, and also under the mutual plan. The first twenty-three sections relate to stock companies, under the name of " insurance companies," and §§ 24–39 relate to " mutual insurance companies." As the corporation, prior to 1854, had been acting as a mutual company, the reference to the Revised Statutes in the St. of 1854 was to " all the powers and privileges," and to " all the duties, liabilities, and restrictions " contained therein, relating to stock companies. By the St. of 1848, *c.* 124, the company was empowered to make insurance upon the mutual plan, and, as such mutual insurance company, it enjoyed all the powers and privileges, and was subject to all the duties and liabilities, which the statutes imposed upon mutual insurance companies. The St. of 1854 gave it the additional right to insure " otherwise than on the mutual principle," and imposed upon it the laws governing companies conducting such business. The Rev. Sts. *c.* 37, refer only to stock companies, to mutual companies, and to foreign insurance companies. In those sections relating to stock companies, there was no limit to the number of stockholders; the directors, at such times as their charter or by-laws prescribed, were to make dividends of so much of the profits and of the interest arising from the capital as to them appeared advisable. The statement of the profits was to be laid before the stockholders biennially; and in certain contingencies the directors were made liable. It would seem that, under the Revised Statutes, if the company, in transacting business "otherwise than on the mutual principle," was governed by these laws, it was necessary to keep the business of each department separate and distinct.

Since its guaranty capital was paid in, the company has kept separate accounts of the business carried on in the stock and mutual departments, and of the receipts and expenditures in each. None of the assets or earnings of one department have been applied to payment of losses or dividends of the other. The dividends to shareholders have been paid from the earnings of the stock department. None of the earnings of this department have been paid as dividends to the holders of policies issued by

the mutual department. The salaries, rents, and other general expenses of the company were divided between and borne by the two departments, in proportion to the amount of cash premiums received by them respectively. The tax assessed on account of the guaranty capital was paid by the company, and charged to the stock department. Practically the company considered that, under a common board of directors, there were two separate and distinct organizations, one governed by the laws relating to stock companies, and the other by those relating to mutual companies. Two branches of business were conducted, each independent of the other, with distinct interests, but under a common head.

The by-laws which the company passed in anticipation of raising the guaranty capital were, in some respects, without authority of law. Article 4, which provided that, before the subscription books were opened, the directors should determine the rate per cent of the semiannual dividends, and that the rate thus fixed should not be reduced without the written consent of each and every shareholder, was in direct conflict with the Rev. Sts. c. 37, § 15. The dividends were to be made on profits, and depended on profits, and were to be made as to the directors appeared advisable. The company had no authority to establish them in the arbitrary manner attempted by this by-law.

Article 10 directed the manner in which the funds of the company arising from premiums or assessments, or from any other source, should be appropriated. By this article the funds were to be appropriated to the payment, first, of expenses; secondly, of losses by fire; thirdly, dividends on the guaranty capital, and to make good any reduction in the amount of said capital; and fourthly, return premiums and dividends on policies upon the mutual principle, as they shall expire. The Revised Statutes, c. 37, § 31, made provision for the appropriation of the funds of mutual companies in a different manner. This article of the by-laws contemplated no distinction between the two departments, and no division of their interests or funds.

Soon after the company was organized under its new plan, the St. of 1856, c. 252, was passed. It provided, in § 36, that "all business and all investments on account of the stock department of such [namely, mutual] companies shall be separately kept,"

and " the business done on the mutual principle shall also be kept separate." The plaintiff has complied with the statute, and has not followed the requirement of article 10 of its by-laws. The dividends have been paid from the earnings of the stock department, and no occasion has arisen to make good any reduction in the amount of the guaranty capital.

The plaintiff contends that the guaranty capital was practically a loan by the shareholders to the company, to enable it to carry on the stock business. Mutual fire insurance companies were required to have a guaranty capital before they could insure. The charter of the Berkshire Life Insurance Company contained a similar provision. In *Commonwealth* v. *Berkshire Ins. Co.* 98 Mass. 25, it was held that this guaranty capital was a liability; that it was in no proper sense a capital of the company; that the shares did not, as in stock corporations, represent aliquot fractional interests in the property and franchise; and that it was a liability rather than a part of the assets of the company. It was decided in this case that the corporation, a mutual insurance company, was not liable to a tax on its unredeemed guaranty stock, upon the ground that the fund stood as a security for the payment of losses upon policies; that it was tantamount to a debt due from the corporation, for the ultimate payment of which provision was constantly made; that the stockholders had no interest in the business of the company beyond the payment of their stipulated dividends, and the maintenance of the sinking fund out of which their stock was eventually to be redeemed. The court said: " By the St. of 1864, *c.* 208, §§ 1, 5, a return is required from, and a tax imposed upon, ' every corporation having a capital stock divided into shares; ' which is computed on ' the excess of the market value of all the stock of each corporation ' ' over the value of its real estate and machinery.' The return is also required to be made ' by the stock department of stock and mutual insurance companies.' These are companies which under one charter unite two separate branches of business, the stock department doing a stock business, and the mutual department a mutual business, each independent of the other, with distinct interests, and constituting two companies under one corporate organization." And the provision in the act to include the stock department of stock

and mutual companies, was considered as affording a strong presumption that the Legislature did not contemplate the taxation of mutual companies upon their guaranty stock.

In the case at bar, the company has regularly paid the tax upon its guaranty capital and charged it to the stock department. It is to be assumed that this would not have been paid by the company, unless it was done in compliance with the provisions of law, especially after the decision, in 1867, of *Commonwealth* v. *Berkshire Ins. Co.*, *ubi supra*. We think that there is a marked distinction between the guaranty capital referred to in the case cited, and the guaranty capital of a company doing business upon the stock plan, and that the capital of the latter is not a debt, and cannot be construed as a loan to the company to enable it to carry on the stock business.

The plaintiff contends that, in acquiring the fund, the company made certain promises set forth in the by-laws and votes of the directors; that the risks and liabilities were all upon the side of the corporation; that the subscribers and shareholders differed in no respect from every lender of money; that there was a written contract between the subscribers to the fund and the capital, and by that contract the rights of the parties thereto must be determined; that by this contract, as shown in the by-laws and votes, the shareholders were to take the dividends upon their stock as guaranteed to them, without any liability for losses; and that, if the capital should be reduced, it was to be repaired by the mutual department.

We have been referred to several statutes passed subsequently to the creation of the guaranty fund, for the purpose of showing that it has been the policy of legislation to keep the stock and mutual departments of companies organized to do business upon both plans distinct from each other, and not to subject mutual policy holders to any liability for losses in the stock department, or for any impairment of the guaranty capital. The St. of 1878, c. 141, § 2, provides that "the mutual policy holders shall not be entitled to participate in the profits of the stock department, nor shall they be liable to assessment to repair any deficiency in the guaranty capital arising from losses in said department; but said deficiency shall be repaired from the reserve fund of said department, and, if said fund is not

sufficient therefor, by the shareholders in the manner provided by law in the case of joint stock fire insurance companies." Although this statute was enacted several years after the plaintiff commenced doing business upon the stock principle, yet we think it states in general terms the law which governed such companies before its passage. The stock department was organized and governed by the laws governing stock companies. The mutual department was in like manner subject to the laws governing mutual companies. There was no legal authority for securing the contributors to the guaranty capital by the mutual company. The statutes fixed the liabilities imposed upon the holders of mutual policies, and the company could not enlarge these liabilities. The funds of such companies were to be appropriated first to pay the expenses of the corporation, and then to pay the damages which any member might be entitled to recover on his policy; and the directors were authorized to assess such sum as might be necessary to pay the same upon the members, in proportion to the amount of their premiums and deposits severally for seven years. Rev. Sts. *c.* 37, § 31. Section 38 provided that every member, at the expiration of his policy, should have a right to a share of the funds then remaining, after deducting payments of expenses and losses, in proportion to the sums actually paid on account of such policy.

If the business of the stock department was not sufficient to authorize dividends to be declared to the stockholders, there was no provision of law by which the members of the mutual department could be assessed for the purpose of making it up to them. The company had no right given it by statute to pledge its assets to the payment of dividends, or of deficiencies in the capital of the stock department. The statutes which regulated assessments prescribed also the manner of appropriating the funds so raised.

We think that this was not a contract between the subscribers to the guaranty fund and the company. The statute authorized the corporation to form the stock department. This department was to transact a stock business independently of the mutual department. Its interest was distinct and separate. The laws governing it were those which governed stock companies. The two had one controlling head, but in all other respects they

were each as distinct as though they had separate charters   We cannot agree with the plaintiff, that the subscribers to the guaranty fund were subject to no risk and no liability.   The risk and liability to which they were subject were the same as if they had not been connected with the mutual department, but had been conducting business upon the stock principle only.

The surplus which the plaintiff now contends should be decreed to the company was derived from the stock department, from the profits of its business conducted under the guaranty capital, and from the gains of its profitable investments.   Under the Rev. Sts. c. 37, § 15, the directors of the company, if it had appeared to them advisable, could have distributed the entire surplus among the stockholders as dividends.   There is no provision of law by which it can be decreed to the mutual department of the company.   Under § 38 of the same chapter, to which we have already referred, the mutual department was required by law to account for the accumulations of the stock department to each holder of a mutual policy as it expired, if the proposition contended for by the plaintiff is correct.   And if the court should now decree that the mutual department of this company is entitled to any share in these accumulations, all the mutual policy holders during the thirty years that the guaranty capital has been in existence would be entitled to their proportionate share in the same.

The shareholders have deposited money and created the guaranty fund upon their own risk.   If the business had been unsuccessful, they would have been the losers.   The mutual department, notwithstanding its by-laws and votes, could not have been compelled to contribute to make good their losses. The surplus stands credited to the stock department, and it seems to us to be just and equitable that, in winding up the affairs of this department, this surplus, together with the guaranty capital, should be distributed among the shareholders of the fund, according to their several shares.

*Decree accordingly.*